444

J. T. Hedrick, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 33533.   Promulgated October 26, 1931.

*William J. Byrne, Esq.,* and *Thos. F. Burke, Esq.,* for the petitioner.

*J. L. Backstrom, Esq.,* for the respondent.

446

450

OPINION.

MATTHEWS: (1) With respect to the first issue and the correctness of the respondent's application of the rule, "first in first out," there is no dispute as to the sale price of the various lots of American Tobacco Company stock. The deficiency in tax results from the respondent's determination, in application of this rule, of gain enuring to the petitioner. The petitioner contends, on the other hand, that his gain is measurably less, since it represents the difference in each instance between the sale price of a lot and the purchase price of the next preceding lot bought.

The rule applied by the respondent is that contained in article 39, Regulations 62 and 65, as follows:

When shares of stock in a corporation are sold from lots purchased at different dates and at different prices and the identity of the lots can not be determined, the stock sold shall be charged against the earliest purchasers of such stock. The excess of the amount realized on the sale over the cost or other basis of the stock will constitute gain.

The applicable section of the Revenue Act of 1921 is section 213:

That for the purposes of this title (except as otherwise provided in section 233) the term "gross income"—

(a) Includes gains, profits, and income derived from * * * sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits, and income derived from any source whatever.

The testimony of the petitioner at the hearing established without contradiction the cost price and sale price of the various lots purchased and sold during the taxable years and the number of shares, or the equivalent of scrip, owned prior to 1923 and the total cost of such stock, so that the sole question at issue is the application of the rule laid down by article 39 of the regulations.

The petitioner had projected a scheme for benefiting certain charities with which he had been connected for some time and at the same time creating annuities for himself and after his death for his widow and family. Two of these contracts were carried out, and, as under the terms of these contracts it was necessary for the petitioner within three years of their execution, or in the spring of 1925, to deliver A. T. stock in lieu of the mortgages originally transferred, he made a natural effort to accumulate sufficient stock to carry through these obligations. Each contract referred to $25,000 of stock, so that the total donation would have been only $50,000 stock, par value. But it appears he also intended to write similar contracts with certain other charities. Upon this general intention to reserve definite amounts of stock for these contracts petitioner bases his specific intention to sell a certain definite block of A. T. stock in each of the four sales in dispute.

The sales made in 1923 and 1924 by Moyse & Holmes for petitioner other than the short sale were of stock held as collateral in his regular account. It is impossible to identify shares and lots thus held. The rule of "first in first out" is applicable to the stock in this account, notwithstanding the fact that the seller intended to sell the shares purchased on a particular date. *Burdett Stryker*, 21 B. T. A. 561.

Clearly the stock in petitioner's possession and on deposit with banks as collateral for loans and in petitioner's account with McDonnell & Company was not the stock sold by Moyse & Holmes for petitioner. The "first in" the account from which the 1923 sale was

made, was the purchase of $15,000 scrip on September 29, 1922. The "next in" was the $11,900 scrip purchased October 27, 1922, but $15,000 scrip was taken out on November 15, 1922, and delivered to the Hanover Bank as collateral for a loan to petitioner. This $15,000 scrip, then, is the "first out" of the account and we see no reason why the same principles should not be followed in the case of stock delivered to the customer, as well as with respect to stock sold for the customer. After delivery of this $15,000 scrip, the $11,900 purchased on October 27 became the "first in" the account. This scrip was converted into 119 shares of A. T. "B" stock on March 1, 1923. Then comes the 500-share lot purchased on September 5. The sale of a 500-share lot on November 27, 1923, should be charged against the 119-share purchase and 381 shares of the purchase made on September 5.

In 1924 there were delivered to the regular account the 725 shares held in the special loan account and 656 other shares, all of which were purchases made prior to 1923 and which were held elsewhere than in petitioner's regular account with Moyse & Holmes during 1923. Both this stock and the 500-share lot purchased on August 11 were commingled with the other A. T. "B" stock held in the account and with A. T. "B" stock held as collateral for other customers. There were no means of identifying the particular block of stock sold on October 9, 1924. The purchase of 500 shares on October 23 was also commingled with the A. T. stock held by Moyse & Holmes for its marginal customers and there were no means of identification of the particular stock sold on December 2 and 3, 1924.

The Commissioner computed the profit on the short sale as the petitioner did, so there is no controversy as to that sale. In computing the profits on sales in 1923 and 1924, other than short sales, the Commissioner used the average cost of the 1,444 shares owned prior to November 27, 1923, based on a total cost of $164,144.85. This included the 119 shares purchased in October, 1922, for $18,236.09 and which we find were sold in 1923. The principle followed by the Commissioner is approved, but the average cost of the stock sold in 1924 should be determined by eliminating the 119 shares and the cost of such shares. Since the stock against which the purchases should be charged was held on December 1, 1921, petitioner is entitled to have the profit on such sale computed under the provisions of section 206. The deficiency notice shows that computation of income for 1924 allowed petitioner the benefit of this section.

(2) We come now to the second issue, whether the petitioner made a bona fide gift to his wife prior to the taxable years of 500 shares of American Snuff Company stock. As this Board has said:

\* \* \* To constitute a gift in contemplation of law, there must be (1) an intention on the part of the donor to give—that is, to surrender complete control and dominion over the property to the donee; (2) there must be an acceptance of the gift by the donee; and (3) there must be a transfer of title accompanied by delivery of the property. *Charles Greenblatt,* 2 B. T. A. 77; *Estate of David R. Daly,* 3 B. T. A. 1042; *F. J. Vlchek,* 7 B. T. A. 1244; *J. T. Lupton,* 19 B. T. A. 166.

The petitioner clearly stated his intention to give the stock to his wife about Christmas, 1922. In January, 1923, when he opened his first books, he entered opposite the entry " 700 shares " of American Snuff Company stock a pencil notation, " 500 Mrs. J. T. H.," in the presence of his bookkeeper, at the same time telling him that these shares were Mrs. Hedrick's property. In petitioner's memorandum book he entered the dividends on these 500 shares in 1923 and again in 1924 to Mrs. Hedrick's credit. It was not until 1926 that the petitioner created in his books a special account for Mrs. Hedrick. All these accounts and statements of petitioner's show unmistakably an intention to give the 500 shares to his wife. And on her part she understood that they were hers and in her returns of income for the taxable years included the dividends on this stock.

The only fact, therefore, which raises any doubt as to the nature of this gift was petitioner's retention of the American Snuff Company stock in his account with his New York brokers during the taxable years. But Mrs. Hedrick did not object to such a retention for trading purposes. He held it with his own American Snuff Company stock, but she received its fruits every year in the dividends. Where such an understanding exists we do not see any valid reason for questioning the delivery of the stock by petitioner to his wife. The mere fact that the stock was held in petitioner's name, and not his wife's, is in such circumstances immaterial, as we held in *John Knell,* 12 B. T. A. 1306; *Milton A. Holmes,* 21 B. T. A. 584.

On the second issue, therefore, we hold for the petitioner.

(3) The third issue is whether the dividend, $27,054, received by petitioner on February 6, 1924, from the Lexington Grocery Company was paid by that company from surplus accumulated prior to March 1, 1913, as the petitioner contends, and, therefore, not taxable, or from later accumulated surplus. The relevant provision of the Revenue Act of 1924 is as follows:

Sec. 201. (a) The term " dividend " when used in this title (except in paragraph (9) of subdivision (a) of section 234 and paragraph (4) of subdivision (a) of section 245) means any distribution made by a corporation to its shareholders, whether in money or in other property, out of its earnings or profits accumulated after February 28, 1913.

(b) For the purposes of this Act every distribution is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings or profits. Any earnings or profits accumulated, or increase in value

of property accrued, before March 1, 1913, may be distributed exempt from tax, after the earnings and profits accumulated after February 28, 1913, have been distributed, but any such tax-free distribution shall be applied against and reduce the basis of the stock provided in section 204.

There is no dispute of fact. The only question is whether the dividend of $40,500 paid its stockholders by the company on February 6, 1924, was paid from earnings accumulated prior to March 1, 1913, and therefore not taxable. The resolution of this question involves the question whether the stock dividend declared by the company on December 29, 1920, in the amount of $150,000, was a " distribution " within the meaning of the same section of the Act, since, if it is, the presumption of the statute that it is " from the most recently accumulated earnings " will apply to it, with the result in the instant case of so far reducing the available surplus accumulated since February 28, 1913, that practically all the cash dividend of February 6, 1924, must be taken to be a distribution of surplus accumulated prior to March 1, 1913, and so exempt from tax.

The company had a surplus of $79,709.77 on March 1, 1913, which had grown to $254,629.55 on January 1, 1920. This was reduced by the stock dividend of December 29, 1920, by $150,000, so that the surplus on January 1, 1921, including earnings for 1920, was $126,990.42; and on January 1, 1924 (still reckoning in the stock dividend), was $100,178.53. Two dividends were paid in 1924 prior to the one in question, one of $2,411 on January 16 and the other of $16,000 on February 2. This would leave a surplus on February 5, 1924, just prior to the declaration of the dividend in question, after a proportionate amount of the company's earnings for 1924, $28,682.99, are figured in and Federal tax liabilities for 1918, 1919 and 1923 deducted, of $79,751.39. If the Federal income tax for 1924 be regarded as accrued ratably throughout the year, the surplus would be less than $79,709.77, the surplus of March 1, 1913, and consequently the entire dividend of February 6 would be exempt from tax as a distribution of surplus accumulated before March 1, 1913. Without such allowance of 1924 Federal income tax, the February 5, 1924, surplus would still be only $41.62 in excess of the surplus of March 1, 1913 or $79,751.39.

On these facts it is contended by the petitioner that the stock dividend is a " distribution " within the meaning of the 1924 Revenue Act and with respect to such, therefore, the presumption of that statute applies, that it was made from most recently accumulated earnings. This presumption admittedly applies to the later cash dividend, if the facts of the case allow. If no presumption applies to the stock dividend, therefore, we still have in effect the presumption respecting the cash dividend, which would on the facts render

the latter dividend taxable. If we were to indulge any presumption as to the stock dividend, it would be the natural one of "first in first out," which is applied to the sales of unidentifiable stock shares bought and sold at intervals; in other words, it would be natural to assume that the stock dividend here declared was a distribution from earliest accumulated surplus. It was, undoubtedly, to overcome this "natural" presumption and the consequent possibilities of tax avoidance that the presumption that a "distribution" was made from most recently accumulated earnings was written into the statute. It follows, then, that the stock dividend, in order to be regarded as paid from surplus accumulated subsequent to March 1, 1913, must be brought within the statutory presumption as a "distribution." The later cash dividend is clearly controlled by that presumption, and the priority of payment of the stock dividend, unaffected by the statutory presumption, is, on the present facts, immaterial.

Whether a stock dividend is a "distribution" within the meaning of section 201(b) has already been passed on by this Board in several cases. In *Hugh R. Wilson*, 3 B. T. A. 957, the Board construed the words "any distribution" in the similar provision, section 201(b) of the Revenue Act of 1918. It was the essence of the taxpayer's contention in that case that the Supreme Court's decision in *Eisner* v. *Macomber*, 252 U. S. 189, holding a stock dividend not taxable did not affect the interpretation of this section so as to prevent a stock dividend being considered a "distribution of earnings or profits." The Board pointed out that the 1918 legislation was passed while *Eisner* v. *Macomber* was still pending before the Supreme Court. The court had intimated its position in *Gibbons* v. *Mahon*, 136 U. S. 549, and still more strongly in *Towne* v. *Eisner*, 245 U. S. 418; but the Act intended to tax stock dividends, if possible:

Two purposes clearly appear in the 1918 Act: (1) The earnings of a corporation accumulated after February 28, 1913, were to be subject to tax when distributed to stockholders, and (2) stock dividends were to be taxed to the extent to which they distributed such profits.

The Board's reasoning appears in the following statements:

* * * The word "distribution" used in the Act appears to have been deliberately chosen in the light of the language used by the court in *Gibbons* v. *Mahon, supra*, either to include or exclude a stock dividend, dependent upon whether or not such a dividend was a distribution. Nowhere in the Act are the words "any distribution" defined. Nowhere is a stock dividend stated to be a distribution. The Act assumes that a stock dividend is a distribution of property by a corporation to its stockholders. It is only if this assumption be correct that a stock dividend is to be deemed to be made from earnings and profits accumulated since February 28, 1913, for it is clear from the Act that it is only where a distribution takes place that any presumption arises as to the source of such distribution.

It is contended that the 1918 Act, while not defining the words "any distribution," plainly intended that a stock dividend should be included within those words. It is our opinion that the Act had the twofold purpose mentioned above, and that the words "any distribution" were intended by the draftsman of the Act and by Congress to include only what the words import, namely, a distribution of property by a corporation to its stockholders, and that, a stock dividend having been held not to be a distribution of property by a corporation to its stockholders, it does not fall within the word or intent of the statute.

\* \* \* \* \* \* \*

\* \* \* We have pointed out above that the words "any distribution" are not defined, and that, in our opinion, the words were intended to include only what was in fact a distribution, leaving it for the courts to determine what was and what was not included within that term. Entirely aside from the decision that so much of the law as taxes a stock dividend as income is unconstitutional, the Supreme Court has pointed out that a stock dividend does not, in fact, distribute any property, and for that reason such a dividend does not, we believe, fall within the words "any distribution."

In *W. R. Kennish*, 4 B. T. A. 303, the Board followed the *Wilson* case (1918 Act). So also in *George W. Megeath*, 5 B. T. A. 1274, also under the 1918 Act. Cf. *Walker* v. *Hopkins*, 12 Fed. (2d) 262.

The petitioner's contention here would seem to be concluded on the authority of these cases.

The petitioner, however, develops an laborate argument to the effect that within the meaning of the 1924 Revenue Act "distribution," wherever used, is intended to include stock dividends. It is said that section 201 (f) clearly indicates an intention to include in "distributions" stock dividends. Section 201 (f) reads as follows:

A stock dividend shall not be subject to tax, but if before or after the distribution of any such dividend the corporation proceeds to cancel or redeem its stock at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.

We think this argument is completely answered by the Board's reasoning in the *Wilson* case, *supra*, for it was there pointed out that on the theory of *Eisner* v. *Macomber*, *supra*, a stock dividend was not a distribution from profits, and it could not, therefore, be so regarded under section 201 (b). Of course, a stock dividend must be "distributed" in order for it to reach the company's stockholders, but the use of the word "distribution" in section 201 (f) with reference to stock dividends, can not vary the technical and restricted meaning which we believe it has as used in subsection (b).

But the petitioner does not rest here. He argues that Congress has the power as a matter of grace or bounty to exempt from taxa-

tion as income certain things properly classifiable as income under the Sixteenth Amendment. With this we agree. Cf. section 213 (b), Revenue Act of 1924. He predicates upon this premise the argument that Congress intended in the Revenue Act of 1924, enacted, of course, after the Supreme Court's decision in *Eisner* v. *Macomber*, to allow the distribution of stock dividends even though not taxable, as " distributions " from profits under section 201 (b). In support of this argument he points out the different language of section 201 (f) of the 1926 Act and infers an intent on the part of Congress to withdraw a benefit to the taxpayer existing under the corresponding section of the 1924 Act. On the question of interpreting a prior act in the light of a subsequent act, he cites G. C. M. 7285, I. R. Bulletin IX–1, p. 3; G. C. M. 6717, I. R. Bulletin, IX–2, p. 9.

For the reasons already stated, we do not find this argument persuasive. Nor do we find the reasoning of the *Wilson* case with reference to the 1918 Act any less cogent when applied to the 1924 Act.

Judgment on the third issue, is, therefore, given for the respondent.

*Judgment will be entered under Rule 50.*